UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | | |
|---|---|---|
| DANIEL WORDEN, | ) | C/A No.:  8:06-cv-1074-GRA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | **(Written Opinion)** |
| SUNTRUST BANKS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on both parties' Motions for Summary
Judgment filed on February 1, 2007.  The parties are in agreement that no genuine
issue of material fact exists.  After considering the parties' respective motions,
responsive pleadings, and oral argument, the Court grants Defendant's Motion for
Summary Judgment and denies Plaintiff's Motion for Summary Judgment on the
grounds set forth herein.

## I.  FACTUAL BACKGROUND

Plaintiff Daniel Worden ("Plaintiff") alleges two causes of action against
Defendant SunTrust Bank ("Defendant" or "SunTrust"):    (1) that Defendant
discharged Plaintiff based on the results of polygraph examinations in violation of
the Employee Polygraph Protection Act ("EPPA"), 29 U.S.C. § 2002(3); and (2)
that Defendant used, accepted, or referred to the results of Plaintiff's polygraph
examinations in violation of the EPPA, 29 U.S.C. § 2002(2).

Defendant employed Plaintiff most recently as an Assistant Manager at a
bank branch in Anderson, South Carolina.  (Worden Dep. I  71-72; Ex. 3).  Kevin

Brock ("Brock") was the Area Manager responsible for Plaintiff's branch. Brock reported to Kent Dill ("Dill"), the Retail Line of Business Manager, and Dill reported to Charles Perry ("Perry"), the President & CEO of Defendant's South Carolina Region. (Brock Dep. 10; Perry Dep. 9).

This case involves an attempted bank robbery that took place on August 11, 2005 at the SunTrust bank branch where Plaintiff was employed. Plaintiff contends that he was confronted by masked intruders when he arrived home the evening of August 10, 2005; that he, his roommate, and his roommate's wife (Gary and Anna Tyas) were bound, blindfolded, and held hostage all night; and that the kidnappers used him in an attempt to extort money from the bank when it opened the next morning. The robbery attempt failed, however, when the bank employees called the police. (Worden Dep. Ex. 6).

The City of Anderson Police Department investigated the alleged kidnapping, and the Federal Bureau of Investigation ("FBI") investigated the attempted bank robbery. The day of the attempted bank robbery, the police and SunTrust personnel began to learn the details of what had allegedly occurred the previous night and that morning. (Brock Dep. 35). Almost immediately, law enforcement and SunTrust became suspicious of Plaintiff's possible involvement in the alleged kidnapping and attempted bank robbery. (Brock Dep. 35). For example, Plaintiff's statement that the robbers wanted the money put in "teal bags" raised suspicions because these were bags that were used internally and only individuals who worked at SunTrust would even know that they existed. (Brock Dep. 35-36).

2

Also, a police officer remembered that the movie *Bandits*, whose theme involves home invasion bank robberies, had just recently aired on television. (Brock Dep. 37, 50).

At Plaintiff's request, Brock went to the police department to meet with Plaintiff. Loretta Rohrer-Norris ("Rohrer-Norris"), SunTrust's Regional Security Manager, also arrived at the police department that evening. (Worden Dep. II 9-10; Brock Dep. 17-18, 28; Rohrer-Norris Dep. 4). At some point during the afternoon, Brock learned from the police that there were inconsistencies between Plaintiff's statement and the statements that the Tyases had provided. (Brock Dep. 37). The police told Brock that Plaintiff had previously been suspected of stealing from a former employer in Anderson. (Brock Dep. 37, 51). The police further advised Brock that they considered Plaintiff to be a suspect in the alleged kidnapping and attempted bank robbery. (Brock Dep. 37).

John Zamberlin ("Zamberlin"), the police investigator assigned to the case, asked Plaintiff if he was willing to take a polygraph, and Plaintiff said that he would consent. (Worden Dep. II 15). SunTrust was not present during Zamberlin's interview with Plaintiff and had no prior knowledge that Zamberlin intended to ask Plaintiff to consent to a polygraph. (Zamberlin Aff.). SunTrust did not request that Plaintiff submit to a polygraph examination. (Worden Dep. II 16). The request that Plaintiff submit to and the administration of the polygraph examination was made by the police alone. (Brock Dep. 24-25).

The polygraph examination was administered at approximately 11:00 p.m.

3

(Worden Dep. II 21).    SunTrust was not present for, and did not witness or observe, this examination.    (Brock Dep. 30-31).    After the examination, the polygrapher walked into the squad room, where Brock and Rohrer-Norris had been sitting off and on since they arrived at the police station earlier that evening, and announced without request and within everyone's earshot, that Plaintiff had failed the polygraph examination and that he believed Plaintiff was involved in the incident. (Brock Dep. 32, 44, 88-89; Rohrer-Norris Dep. 44-47).    The polygrapher added, however, that he felt a defense attorney could challenge the results as inconclusive because of Plaintiff's lack of sleep and having allegedly experienced a traumatic event.    (Brock Dep. 32).    SunTrust never saw or received the polygrapher's report of this examination.    (Brock Dep. 45, 50, 72; Rohrer-Norris Dep. 51-52).

On or about August 17, 2005, Zamberlin transported Plaintiff to Greenville, South Carolina where he was interrogated and agreed to submit to a polygraph examination by the FBI.    (Worden Dep. II 39-40).    No SunTrust personnel were present for this examination, and SunTrust did not request that Plaintiff submit to the polygraph examination.    (Worden Dep. II 41-42; Brock Dep. 58; Rohrer-Norris Dep. 24-25).    The request that Plaintiff submit to and the administration of the polygraph examination was made by law enforcement alone.    (Brock Dep. 57).    The FBI Agent that administered the polygraph examination advised Plaintiff that the results showed deception; the FBI also told him that he was considered a suspect. (Worden Dep. II 44-45, 48).    Plaintiff was also told by the City of Anderson police

that he had failed the test. (Worden Dep. II. 45).

At the conclusion of the FBI interrogation, Zamberlin called Brock and asked if he could transport Plaintiff back to Anderson. (Worden Dep. II 48-49; Brock Dep. 58). Although Brock did not ask, Zamberlin advised him that Plaintiff had "failed miserably" the polygraph examination administered by the FBI. (Brock Dep. 59, 66-67). When Brock arrived, Plaintiff also told him that he had failed the polygraph examination. (Worden Dep. II 49; Brock Dep. 67). Rohrer-Norris was also advised by an FBI Agent that Plaintiff had failed this polygraph examination. (Rohrer-Norris Dep. 24). Neither Brock nor Rohrer-Norris requested information regarding Plaintiff's polygraph examinations; law enforcement and Plaintiff simply advised them of the results unilaterally. (Rohrer-Norris Dep. 24; Brock Dep. 59, 66-67; Worden Dep. II 49).

During the course of the police investigation, Brock and Rohrer-Norris were kept apprised of the developments by the police and/or FBI. (*See* Brock Dep. 22-23, 37, 55, 75, 119; Rohrer-Norris Dep. 24). Because the situation involved state and federal crimes, Brock and Rohrer-Norris relied on law enforcement to investigate the crimes, as opposed to conducting their own investigation. (Rohrer-Norris Dep. 31, 35, 55-56; Brock Dep. 52). They both reported the information they obtained to Dill and/or Perry. (*See* Brock Dep. 18, 45, 52-53, 60, 103, 131; Perry Dep. 6, 12-14, 43-44; Dill Dep. 17, 29). Dill and Perry were informed of the results of both polygraph examinations, as well as all of the other information obtained from the police relating to the suspicion that Plaintiff was involved in the

5

crime.  (Brock Dep. 52-53, 60; Perry Dep. 14-15; Dill Dep. 17-18; Rohrer-Norris Dep. 50).

Perry and Dill made the decision to terminate Plaintiff's employment.  (Perry Dep. 15-16, 24; Dill Dep. 15).  Dill and Perry did not discuss the polygraph results in concluding that Plaintiff should be discharged.  (Dill Dep. 27-28, 53-54).  They based their decision on the unresolved suspicion, both SunTrust's and law enforcement's, that Plaintiff was involved in the attempted bank robbery on August 11, 2005.  (Perry Dep. 17, 42-43; Dill Dep. 37, 53).  It is undisputed that this suspicion, and SunTrust's decision, were supported by substantial circumstantial evidence.[1]

Based on the totality and cumulative effect of all of the circumstantial evidence pointing to Plaintiff's involvement in the crime, Perry and Dill made the decision to terminate Plaintiff's employment.  (Perry Dep. 24, 42; Dill Dep. 19, 26-27).  On September 1, 2005, Brock met with Plaintiff and advised him that his employment was terminated.  (Worden Dep. II 80).  Brock did not mention the results of the polygraph examinations during the termination meeting.  (Worden Dep. II 82-83).

Plaintiff later filed a claim for unemployment benefits with the South Carolina Employment Security Commission ("ESC").  (Worden Dep. II 82).  In the paperwork for this claim, Plaintiff acknowledged that he was considered a suspect by the

---

[1]  See Defendant's Memorandum in Support of Summary Judgment, pp. 13-20, for a list of the overwhelming amount of circumstantial evidence connecting Plaintiff to the attempted bank robbery.

police.  (Worden Dep. Ex. 10).  Plaintiff contends that Brock testified at the ESC hearing that Plaintiff was terminated because of the results of the polygraph examinations.[2]  (Worden Dep. II 82).

The police have never indicated to the plaintiff that he is not considered a suspect.  (Worden Dep. II 57).

## II.  STANDARD FOR SUMMARY JUDGMENT

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, summary judgment is appropriate where no genuine issue of material fact exists and the evidence establishes that the movant is entitled to judgment as a matter of law. *See Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991).  The facts and inferences to be drawn from the evidence of record must be viewed "in the light most favorable to the non-moving party."  *Id.*  However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987), *cert. denied*, 484 U.S. 897 (1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).  A mere "metaphysical doubt" as to the material fact is not sufficient.  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. The threshold inquiry is "whether . . .

---

[2] The ESC decision was not appealed, so consistent with the ESC's standard practice, there is no transcript of this hearing.  Defendant filed a motion to strike the decision of the ESC on February 20, 2007.  The Court finds this motion moot, based on the granting of the Defendant's motion for summary judgment.

there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250; *see also Matsushita Elec. Ind. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden [of demonstrating the absence of a genuine issue of material fact] under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").

### III.  LEGAL ANALYSIS

**A.    SunTrust Did Not Discharge Plaintiff on the Basis of the Polygraph Examinations.**

   *1.    Applicable Standard*

The EPPA provides that it is unlawful for an employer "to discharge . . . any employee . . . *on the basis of* the results of any lie detector test."  29 U.S.C. § 2002(3)(B) (emphasis added).  The initial question that the Court must decide is what standard should be utilized in assessing a wrongful discharge claim under the EPPA.  Case law under the EPPA is sparse and provides little guidance. Significantly, there is no precedent within the jurisdiction of the United States Court of Appeals for the Fourth Circuit.

In *Mennen v. Easter Stores*, 951 F. Supp. 838, 855-56 (N.D. Iowa 1997), one of the few cases addressing the standard to apply in EPPA cases, the district court rejected the defendant's contention that an EPPA plaintiff must show that the results of a polygraph examination were the sole reason for the adverse

8

employment action.   Such a holding, however, was axiomatic because "the evidence clearly indicate[d] that [the plaintiff's] polygraph test results provided the *only* basis for [the employer's] decision to" take an adverse employment action against the plaintiff.  *Id.*  (emphasis added).  However, the Court declines to follow *Mennen* as it is not binding authority.  Instead, the Court holds that the EPPA does not prohibit the discharge of an employee if polygraph results are "a factor" in the decision, so long as they are not the "sole factor."

   2.   ***Application of Facts to Standards***

        a.   **Sole Factor Test**

Plaintiff has not demonstrated that the polygraph results were the sole reason for Plaintiff's discharge.  To the contrary, unlike the defendant in *Mennen*, SunTrust has demonstrated that it terminated Plaintiff's employment due to a reasonable and good faith belief that he was involved in the attempted bank robbery.   Further, SunTrust has presented an overwhelming amount of circumstantial evidence, not including the polygraph results, that formed the basis of this belief.  This undisputed evidence persuades the Court that no reasonable person could conclude that the polygraph results were the sole reason for Plaintiff's discharge.

Plaintiff's arguments that the evidence shows his discharge was based on the polygraph results are without merit.  He contends that Brock's testimony before the ESC establishes that the polygraph results were the sole factor for Plaintiff's discharge.  (Plaintiff's Memorandum in Support of Motion for Summary Judgment,

p. 19). It is an undisputed fact, however, that Brock was not a decision-maker. His involvement was basically limited to relaying information from the police to Dill and Perry and then informing Plaintiff that his employment was terminated. Perry and Dill told him that the decision had been made, and they had a long discussion about how important trust was to SunTrust. (Brock Dep. 61-62). Dill and Perry mentioned several factors that supported the termination decision, such as law enforcement's belief that Plaintiff was involved,[3] the suspicion that Plaintiff had committed a crime of theft against a former employer, and the inconsistencies in Plaintiff's statements, but the polygraph examinations were not mentioned during this meeting. (Brock Dep. 62, 132). Brock has no personal knowledge regarding the reasons for Plaintiff's termination, so his purported statements about the same are not evidence. Because Brock was not a decision-maker, any alleged statements by him regarding the reasons for Plaintiff's termination are irrelevant.[4] *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989); *Steger v. General Electric Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003).

This argument also ignores the record evidence. Accepting Plaintiff's

---

[3] If there was a determinative factor in reaching the decision, it was that law enforcement told SunTrust that they believed Plaintiff was involved. (Perry Dep. 43; Dill Dep. 37, 53).

[4] For this same reason, Plaintiff's assertions related to statements Brock made to Lindsay Foess and Jenna Mayhew, both HR Generalists, and the Termination Form subsequently completed by Foess are irrelevant. (Plaintiff's Memorandum in Support of Motion for Summary Judgment, pp. 9-12; Plaintiff's Opposition to Defendant's Motion for Summary Judgment, p. 6). Although potentially relevant to whether the polygraph results were "a factor" in the decision, this evidence does not refute the established fact that the results were not the "sole factor," or that Defendant would have made the same decision without knowledge of the results.

averment that Brock testified at the ESC hearing that SunTrust discharged him because of the polygraph results as true and admissible, it does not necessarily follow that the polygraph results were the sole reason, or that SunTrust would not have reached the same decision in their absence. Such evidence is relevant only to show that Brock may have believed the polygraph results were a factor in the decision. The uncontroverted record evidence unequivocally establishes that there were a multitude of other factors supporting the decision and that Defendant would have made the same decision even if law enforcement (and Plaintiff) had not disclosed the results to SunTrust.

Plaintiff also argues that Defendant has not presented any evidence that it has discharged any similarly situated employees. (Plaintiff's Opposition to Defendant's Motion for Summary Judgment, p. 8). Plaintiff has again, however, ignored the record evidence. The evidence submitted by Defendant shows that Perry, who made the decision to terminate Plaintiff's employment, has discharged at least one other employee under virtually identical circumstances – with the notable exception that the employee had not taken or been asked to take a polygraph. Specifically, Perry terminated another employee who was the suspect in a criminal investigation conducted by law enforcement even though the evidence in question was entirely circumstantial, the employee did not confess, and the authorities had not pressed charges. (Perry Aff.). As with Plaintiff, it was the mere fact that this employee was suspected by SunTrust and the authorities that served as the basis for the decision to terminate her employment. The fact that

11

this employee, who had not been involved with a polygraph, received the exact same adverse employment action as Plaintiff clearly demonstrates that Plaintiff's employment would have been terminated even in the absence of SunTrust's knowledge of his polygraph results and that the polygraph results were not the only reason for the decision.

Plaintiff further argues that the timing of the discharge decision indicates that SunTrust based its decision to terminate his employment on the results of the second polygraph and not the suspicion of his involvement.  The Court finds nothing suspicious or nefarious, however, with regard to the timing of the decision. Perry and Dill reached the decision to discharge Plaintiff in late August 2005. Although they had learned most of the suspicious circumstances fairly early into the investigation, the police asked SunTrust not to terminate Plaintiff's employment in an effort to keep him cooperating in their investigation.  (Perry Aff.).  Plaintiff had been on administrative leave, receiving his salary since the date of the attempted bank robbery.  (Worden Dep. I 81).  When law enforcement no longer had new information or developments, and it appeared that Plaintiff's arrest was not imminent, Dill and Perry made the decision to terminate his employment.  (Perry Aff.).  SunTrust's desire to cooperate with the police and get more definitive proof of Plaintiff's involvement or non-involvement explains the timing of Defendant's decision.  (Perry Aff.).

Finally, Plaintiff contends that, in response to Plaintiff's Interrogatory No. 12, Defendant listed reasons supporting the discharge decision, but that some of the

reasons provided were unknown to the decision-makers.  (Plaintiff's Opposition to Defendant's Motion for Summary Judgment, pp. 12-13).  This argument fails for several reasons.   First, Plaintiff failed to file Defendant's response to this interrogatory with the Court; therefore, it is not evidence that the Court can consider in this case.  Similarly, much of the testimony on which Plaintiff relies to establish this point was also not filed with the Court.[5]  Second, the evidence of record contradicts Plaintiff's argument.  For example, Perry testified that he was aware that the FBI was unable to identify any crime with a similar modus operandi (Perry Dep. 31); and both Perry and Dill testified that they were aware of Plaintiff's unusual reaction to the unsuccessful robbery.  (Perry Dep. 31-32; Dill Dep. 59-60). Third, it is clear from the evidence that SunTrust relied on law enforcement's suspicions about Plaintiff, and any evidence on which law enforcement relied to form that suspicion is therefore relevant even if SunTrust did not have knowledge of it at the time.   Fourth, even if these few facts are after-acquired evidence, SunTrust still had other, overwhelming evidence at the time of the termination decision.

It is important to note that this case is not about whether Plaintiff committed the crimes, but rather whether SunTrust had a good faith reason to suspect– without using the polygraph results or without relying solely on the results– that Plaintiff was involved and whether that good faith belief was the real reason behind

---

[5]

 Plaintiff did not file pages 44, 47, 48, 52, and 57 from Dill's deposition or pages 33, 36, and 41 from Perry's deposition.

the termination of Plaintiff's employment. *See DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (establishing that courts are not to decide whether reason is fair or correct, so long as it is the true reason); *Lingard v. Carolina By-Products*, 605 S.E.2d 545, 550 (S.C. App. 2004) (holding the inquiry is not whether employee actually committed infraction, but whether employer had good faith reasonable belief that sufficient cause existed).  The evidence clearly demonstrates that the polygraph results were not the sole factor, or even a determinative factor; there was an abundance of suspicious circumstances that formed the basis of Defendant's decision.  Plaintiff failed to present any evidence to contradict or cast doubt on this established fact.

Quite simply, there were too many unanswered questions regarding Plaintiff's involvement, and the police repeatedly told SunTrust that they believed he was involved.  This Court finds that any reasonable employer, especially a bank, would be forced to terminate an employee in these circumstances.  Plaintiff has not established that his polygraph results were the sole factor for his discharge, and SunTrust has demonstrated that it would have made the same decision without regard to the results. Thus, SunTrust is entitled to judgment on Plaintiff's discharge claim as a matter of law.

**B.     SunTrust Did Not Use, Accept, or Refer To the Results of Plaintiff's Polygraph Examinations.**

The EPPA provides that it is unlawful for an employer "to use, accept, refer

to, or inquire concerning"[6] the results of a polygraph examination.  29 U.S.C. § 2002(2).    There is no dispute that law enforcement informed SunTrust representatives of the results of Plaintiff's two polygraph examinations without being requested to do so and that SunTrust therefore had knowledge of these results.  SunTrust did not, however, use, accept, or refer to the results in violation of the EPPA.  For this Court to hold otherwise would penalize an employer who, through no action of its own, unwittingly comes into possession of an employee's polygraph results.    This Court declines to hold Defendant liable for the mere knowledge of Plaintiff's lie detector results where it never asked for that information or had the opportunity to decline it and where Plaintiff himself informed it of the polygraph results.

### 1.    SunTrust did not "use" the results of Plaintiff's polygraph examinations.

This claim is completely duplicative of the claim discussed above regarding Plaintiff's discharge.  Because the results were not the sole or determinative factor in the discharge decision, the Court holds that SunTrust did not "use" the results within the meaning of the EPPA.

### 2.    SunTrust did not "accept" the results of Plaintiff's polygraph examinations.

Through no fault of its own, SunTrust was informed by law enforcement of the results of the polygraphs administered to Plaintiff.  This does not constitute

---

[6]

Plaintiff does not contend that Defendant "inquired concerning" the polygraph results. (Plaintiff's Memorandum in Support of Motion for Summary Judgment, p. 4).

"acceptance" of the results.  The word "accept," in both legal and non-legal contexts, necessarily connotes the ability to decline and requires some action by the person or entity "accepting."  Black's Law Dictionary defines "accept" as: "To receive with approval or satisfaction; to receive with intent to retain. . . . *Means something more than to receive*, meaning to adopt, to agree to carry out provisions, to keep and retain."  Black's Law Dictionary 12 (5th ed. 1979) (emphasis added).

This Court declines to follow the Department of Labor's ("DOL") regulation that provides an employer's mere "receipt" of the results of a polygraph examination from law enforcement is a violation of the EPPA.  Such a regulation goes beyond the authority granted to the DOL by Congress to issue rules and regulations.  To implement the EPPA's provisions, Congress authorized the DOL only to "issue such rules and regulations as may be necessary or appropriate to carry out [the EPPA]."  29 U.S.C. § 2004(1).  The DOL issued final rules for the EPPA, including a provision that "[t]he receipt by an employer of information from a polygraph test administered by police authorities pursuant to an investigation is prohibited by [the EPPA]."  29 C.F.R. § 801(4)(c).  Thus, the regulations promulgated by the DOL make *any* receipt of polygraph information from law enforcement by an employer unlawful under the EPPA, regardless of whether such information was requested, sought, or even desired by the employer.  In essence, such a provision operates to make an employer strictly liable for receiving such information from law enforcement.  Such an interpretation is beyond the scope of

the authority granted by Congress and is irreconcilable with the express terms of the EPPA.

In determining the validity of agency regulations, a court's standard of review "depends upon whether such regulation is legislative or interpretive." *Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 452 (4th Cir. 2004) (*citing Pelissero v. Thompson*, 170 F.3d 442, 446 (4th Cir. 1999)). In this case, the DOL's regulation regarding an employer's receipt of polygraph information from law enforcement is not "legislative" as Congress did not "explicitly [leave] a gap for the agency to fill" and did not delegate authority to "elucidate a specific provision" of the EPPA. *Id.* (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)). Instead, by describing a type of conduct that according to the DOL violates the EPPA, 29 C.F.R. § 801.4(c) operates to "explain how a provision operates" and would be considered an interpretive regulation. *Id.* (citing *Pelissero*, 170 F.3d at 446). As such, 29 C.F.R. § 801.4(c) can only be upheld "if [it] implement[s] the congressional mandate in a reasonable manner." *Id.* (citing *Pelissero*, 170 F.3d at 446)*.* In making such a determination, the Court must assess whether the regulation "'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute . . . [and] should not [be] disturb[ed] . . . unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.'" *Chevron*, 467 U.S. at 845 (citing *United States v. Shimer*, 367 U.S. 374, 383 (1967)).

17

Clearly, the actual language of the EPPA requires more than the employer's passive receipt of polygraph information from law enforcement.  As noted above, in the legal sense, the word "accept" "*[m]eans something more than to receive*. . . ." BLACK'S LAW DICTIONARY 12 (5th ed. 1979) (emphasis added).  "It is well established that when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) (internal quotation marks and citations omitted).  Moreover, in interpreting the plain language of a statute, a court "give[s] the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." *Williams v. Taylor*, 529 U.S. 420, 431 (2000) (internal quotation marks and citations omitted).  Finally, a "cardinal rule [of statutory construction is] that [s]tatutory language must be read in context [since] a phrase gathers meaning from the words around it." *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 596 (2004) (internal quotation marks and citations omitted).

In this case, the statute expressly uses the word "accept," which has a plain meaning beyond mere receipt.  Moreover, the words of the statute surrounding "accept," namely "use," "refer to," and "inquire," all connote active participation by an employer.  "Receipt" connotes no such active participation, a point made dramatically clear by the circumstances of this case where SunTrust did not request Plaintiff's polygraph results from law enforcement, yet would be liable

18

under the DOL's expansive interpretation of the EPPA. When viewed in context of the express language of the statute itself, it is clear that the regulation goes beyond congressional intent. Therefore, 29 C.F.R. § 801.4(c) goes beyond the scope of authority granted by Congress and will not be followed by the Court.

Furthermore, Plaintiff cannot, on the one hand, complain that Defendant "accepted" or "received" the polygraph results from law enforcement when, on the other hand, he unilaterally forced knowledge of the polygraph results upon Defendant.

Accordingly, SunTrust did not "accept" the polygraph results within the meaning of the EPPA.

**3.     SunTrust did not "refer to" the results of Plaintiff's polygraph examinations.**

The implementing regulations do not provide any guidance on the meaning of "refer to" under the EPPA. In fact, the regulations significantly omit the words "refer to" when listing the actions prohibited by the EPPA. *See* 29 C.F.R. § 801.4(a)(2).

Plaintiff argues that Defendant "referred to" the polygraph results at the ESC hearing and in ESC submissions, during internal discussions regarding Plaintiff, and in internal documents. (Plaintiff's Memorandum in Support of Motion for Summary Judgment, pp. 7-8). The Court holds that it would be nonsensical to hold Defendant liable to Plaintiff for "referring to" polygraph results of which Plaintiff himself advised SunTrust. Again, Plaintiff cannot complain about actions for which

19

he is, at least in part, responsible.

Furthermore, Defendant has shown that Plaintiff's employment would have been terminated even without knowledge of the polygraph results. Therefore, even if Defendant did "use, accept, or refer to" the results as Plaintiff contends, the point is moot because the ultimate outcome would not be any different. In other words, any "use, acceptance, or reference to" the results by Defendant was harmless because Plaintiff has not suffered any damage, a necessary component of any claim, as a result of such alleged actions. It defies logic that Congress intended to hold an employer liable in circumstances such as these, where the employer had an overwhelming amount of circumstantial evidence indicating an employee's involvement in a crime, but through no intentional act of its own, it also received polygraph results.

## IV.  CONCLUSION

Plaintiff contends that "[t]he present case involves the very type of situation the EPPA was enacted to prevent." (Plaintiff's Memorandum in Support of Motion for Summary Judgment, p. 20). This Court believes that Congress never fathomed circumstances as unusual as these when enacting the EPPA. It certainly did not legislate that unintentional "receipt" of polygraph results is unlawful. Nor could Congress imagine that an employer, especially a bank, faced with an abundance of circumstantial evidence indicating an employee's involvement in a crime against it, would be prohibited from discharging that employee simply because the police (or the employee) unilaterally provided the results of a polygraph test to the employer.

This is not a case of "fruit of the poisoned polygraph tree" as asserted by Plaintiff. (Plaintiff's Memorandum in Support of Motion for Summary Judgment, p. 21). Just as in criminal cases, where the prosecution can admit evidence purportedly tainted by improper conduct by showing that it would have ultimately been obtained in a proper manner, SunTrust has shown that the polygraph results were not the sole reason for Plaintiff's termination and that it would have terminated Plaintiff's employment even without knowledge of the polygraph results. The EPPA simply cannot be intended to tie an employer's hands and prohibit discharge in a case such as this, where the employer may have knowledge of the polygraph results, but where there are forty other reasons supporting the reasonable belief that Plaintiff was involved in a kidnapping and attempted bank robbery. To hold otherwise would be illogical and create consequences never intended by Congress.

Accordingly, IT IS ORDERED that Defendant's Motion for Summary Judgment is hereby GRANTED, and Defendant's Motion to Strike is hereby DENIED as moot. IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment is hereby DENIED. Plaintiff's claims are dismissed with prejudice. Furthermore, pursuant to Rule 54(d) of the Federal Rules of Civil Procedure, Defendant is entitled to costs as the prevailing party.

IT IS SO ORDERED.


[SIGNATURE PAGE TO FOLLOW]

21

G. ROSS ANDERSON, JR.
UNITED STATES DISTRICT JUDGE

March 22, 2007

Anderson, South Carolina

22